THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v PHILIP
VENTURA, Defendant-Respondent.

First Department, April 23, 1985

APPEARANCES OF COUNSEL

*Joseph J. Hester* of counsel (*Thomas A. Duffy, Jr.,* attorney), for appellant.

*Lawrence H. Levner* for defendant-respondent.

## OPINION OF THE COURT

Ross, J.

The Office of the Special State Prosecutor (SPO) prosecuted the instant case, upon behalf of the People. After trial, the jury found the defendant guilty of the crimes of attempted criminal possession of stolen property in the first degree (Penal Law §§ 110.00, 165.50) and of official misconduct (Penal Law § 195.00 [2]). Subsequently, Trial Term, in an order, entered September 12, 1983, granted defendant's motion, brought pursuant to CPL 330.30, to set aside the verdict and ordered a new trial. SPO is appealing from Trial Term's order. The question presented is: Did Trial Term's refusal to charge entrapment and to allow the defense an opportunity to reopen their summation provide a ground which, if raised upon an appeal from a prospective judgment of conviction, would require reversal or modification of the judgment as a matter of law?

In the early part of 1982, defendant was a police officer with the New York City Police Department (Department). He was assigned to the Crime Scene Unit of that Department, which was located at 280 Broadway, Manhattan. During April 1982, the Department, through its Internal Affairs Division (IAD), commenced an investigation of defendant, based upon allegations that he might be dealing in stolen property. The IAD investigates allegations of corruption against members of the Department, and the instant investigation was conducted under the supervision of New York City Police Captain Charles Reiser (Reiser).

Preliminary investigation by IAD operatives indicated that defendant was frequently seen in a jewelry store (Store) situated at 88 Bowery, Manhattan.

As part of the plan of the investigation, Captain Reiser assigned an undercover New York City police detective by the name of Stella DeCesare (DeCesare) to go into that Store with a gold necklace that had a broken clasp. This necklace had been obtained from the Department Property Clerk's Office and then the clasp on it had been broken on a door jamb or knob before the necklace was given to DeCesare. On every occasion that DeCesare acted as an undercover in this investigation, she wore, concealed on her person, a tape recorder, for the purpose of recording conversations.

The first contact between DeCesare and defendant in the Store took place about 1:00 P.M. on April 5, 1982. Upon entering the Store, DeCesare saw three men behind a work counter, among whom was the defendant. She went directly to that counter and told these men that her grandmother had requested her: (1) to have a necklace checked to determine if it was gold; and, (2) to have it repaired. In response, one of the males, subsequently identified as Harry Goldberg (Goldberg), asked the defendant to test the necklace. After testing it, the defendant told DeCesare that the necklace was not gold; and, that, if she desired, she could have the necklace repaired at another counter in the rear of the Store. Thereafter, DeCesare had the necklace repaired in the manner suggested by defendant. A day later she picked up the repaired necklace; but, at that time, the defendant was not present in the Store.

Next, DeCesare appeared at the Store on April 21, 1982, at about 12:30 P.M. She saw defendant behind his workbench, and she advised him that she had a gold chain she wanted to sell and that she would also like to have it tested. The defendant asked another man to test the chain, and he did. This man quoted DeCesare a price of $38, and asked her for identification. DeCesare replied that she did not have any with her. At this point, defendant interceded on DeCesare's behalf, and he told this man that she had done business in the Store before, and that the sale should proceed without her producing identification. As a result, DeCesare was paid for the chain.

At about 1:00 P.M. on April 22, 1982, DeCesare returned to the Store, with two broken gold chains. When she saw the defendant, she told him, in substance, that she had two more chains to sell. Defendant tested them and told her that only one of them was gold, and he offered her $42.69, which she accepted.

DeCesare made her next visit to the Store on April 26, 1982, at about 2:10 P.M., with three more broken gold chains. First, she discussed with defendant the sale of these chains, and he offered her $95.65 for them. Now, she asked if she could speak with him privately, and defendant agreed.

In substance, she asked the defendant if he would like to buy office equipment like typewriters or calculators. After defendant expressed interest, DeCesare told him that she had a friend who was a security guard at an office building, and he would have no problem obtaining such items. This conversation concluded with the defendant telling DeCesare, on tape: "Mention [to DeCesare's alleged security guard friend] if the price is right; I mean * * * he's gonna get ten cents on the dollar * * * So this way at

least you tell him if it's an eight hundred dollar machine he's gonna get seventy five dollars for it."

Four days later, at about 12:20 P.M. on April 30, 1982, DeCesare again visited the Store. Initially, she discussed with the defendant the sale of still more broken gold chains. Defendant offered her $69 for the two chains that she had with her. Thereafter, she asked him if she could again speak with him privately. Defendant assented. DeCesare told him that she would soon have some typewriters that were now in a storeroom, which meant that they would probably not be reported stolen for some time. Furthermore, she told him that they were three "beautiful" machines, in view of the fact that one of them had been appraised in excess of $2,500 and a second one had a value of over $2,000. Now she asked defendant: (1) how she could get these typewriters to him; and, (2) what would he pay for them? In response, defendant inquired what she wanted. DeCesare replied: "you had told me ten cents on the dollar." Defendant said he was unable to pay that price, since IBM typewriters had too many hidden serial numbers on them, and that made them difficult to sell. Therefore, defendant said if he bought them he would have to take the machines apart, in order to get rid of their serial numbers, and then sell them for parts. After giving this explanation, defendant stated, on tape: "So in other words if you [DeCesare] brought the three pieces [typewriters] * * * I'll give you $300 dollars." DeCesare agreed to this amount. Following this price negotiation, defendant gave DeCesare instructions on how to deliver the typewriters to him. On the same tape, the defendant and DeCesare had this conversation:

"PV [defendant]: Call me Monday * * *

"SDC [DeCesare]: Yeah.

"PV: When you have them.

"SDC: OK * * *

"PV: And then you'll come over here and I'll give you the money.

"SDC: Oh all right.

"PV: In other words you park your car there [at a garage located next to a Mobil Gas Station near Chrystie and Grand Streets] you'll drop them [the typewriters] off there [and] he'll [Joseph 'Joey' Alba] tell you where to put them.

"SDC: OK.

"PV: This way I can pick them up there [at the garage], and you'll be inside [the Store]."

Furthermore, defendant told her to cover the typewriters with plastic bags or a box so that they would not be visible. Before she left the Store, she asked the defendant for his telephone number, and the defendant gave her the Store's business card, which was admitted into evidence, without objection. In pertinent part, this card reads: "BRITE STAR REFINERS We Buy Gold-Silver-Platinum 88 Bowery".

Pursuant to her arrangement with him, on Monday, May 3, 1982, DeCesare telephoned to tell defendant that she had the typewriters. Now, defendant told her to deliver them to the garage, mentioned *supra,* at about 1:00 P.M.; ask for the aforementioned Joseph "Joey" Alba;. and, then come to the Store.

In order for DeCesare to make this delivery at the garage, IAD Captain Reiser placed three IBM typewriters, each one of which was in a large plastic garbage bag, into the trunk of DeCesare's car. Reiser had obtained these typewriters from the Department Property Clerk's Office.

Instead of driving first to the garage, DeCesare drove straight to the Store. When she arrived there, she told defendant that she was afraid to go to the garage and that maybe defendant would like to examine the typewriters. Thereupon, defendant walked outside of the Store with DeCesare and went over to the car. At this point, DeCesare opened the trunk and she asked the defendant if he thought he could give her more than $300; but, defendant said no. Moreover, defendant told her not to be fearful of driving to the garage since his friend "Joey" was there. Furthermore, defendant told DeCesare to tell "Joey" that he had sent her; leave the car there; and walk back to the Store.

After complying with these delivery instructions, DeCesare rejoined the defendant in the Store. While they were talking, the telephone rang. Goldberg, mentioned *supra,* answered it and called out to defendant: "Joey says everything's okay". DeCesare commented to the defendant about his checking out "her stuff", and the defendant replied that he always checks it. Now the defendant handed DeCesare three $100 bills, as payment for the typewriters, which were worth several thousand dollars.

When DeCesare left her car at the subject garage, Police Lieutenant Mark Francis (Francis), who was also assigned to IAD, was observing the garage from a car, which was parked on Chrystie Street, just south of the garage. Francis saw a man get into DeCesare's car, and drive it into the garage. Some minutes thereafter Francis, accompanied by Police Detective Vincent Morano and Police Deputy Inspector Carney entered the garage.

Once inside the garage these three officers confronted "Joey" and asked him about the subject typewriters.

At first "Joey" denied knowing anything, but when DeCesare appeared at the garage, "Joey" took Deputy Inspector Carney and Francis to an upper floor of the garage where the typewriters, each still in its plastic garbage bag, had been stored. Subsequently, DeCesare identified these typewriters as the same ones that she had delivered to the garage.

In the interim, Captain Reiser had entered the Store, identified himself, and requested the defendant to leave the Store with him. As soon as defendant came outside, Reiser told him that he was suspended from the Department. Subsequently, defendant was taken to the SPO where he was questioned. In substance, the defendant admitted that he had been working at the Store for several years, 4 to 5 hours a day, 6 days a week; that he bought the subject typewriters from DeCesare for $300; and, that when he bought them he knew that they had been stolen.

■ After the People rested their case, the defense counsel asked Trial Term whether the defense should also rest. In response, Trial Term told the defense counsel to make up his own mind; but, that if the defense raised the issue of entrapment, then Trial Term would permit the People to reopen their case to present evidence of the defendant's predisposition to commit crimes. We find that Trial Term correctly stated, in accordance with the teaching of *People v Mann* (31 NY2d 253, 259-261) the risks inherent in the entrapment defense.

Following this ruling, the defense counsel engaged in the following colloquy with Trial Term, outside the presence of the jury:

"MR. LEVNER [defense counsel]: The only advantage I would have in not taking an entrapment [defense] would [be to] possibly prevent the Prosecutor from bringing in prior wrong acts, personal history, etcetera. That may be negative to my client.

"THE COURT: That is right.

"MR. LEVNER: If I were to rest now, we would sum up, possibly, tomorrow or the next day?

"THE COURT: That's right.

"MR LEVNER: I understand that. Then, I will rest, Your Honor".

Thus, the defense presented no witnesses at the trial.

Subsequently, during a discussion with Trial Term concerning the instruction to be given the jury, defense counsel suddenly stated that he was now going to raise the entrapment

defense. But, without asking leave to reopen the defense case, defense counsel immediately began delivering his summation.

When the defense summation was completed, the following colloquy took place between Trial Term and counsel, outside the presence of the jury:

"MR. NACHMAN [one of the prosecutors]: Mr. Levner just before he started his summation, raised the defense of entrapment. I didn't hear anything in summation.

"THE COURT: He has not raised it in his summation. It's not raised.

"MR. LEVNER: Well, Your Honor, may I continue?

"THE COURT: No, it's not raised.

"MR. LEVNER: You're precluding me at this time?

"THE COURT: You just finished your summation. We're not going to do it.

MR. LEVNER: I think that is unfair. I think the facts do indicate that there is an entrapment defense here.

"THE COURT: There is [*sic*] no substantial facts in this case and I am not going to give you a second summation at this point."

■ We have examined the defense summation, and we find that Trial Term correctly ruled that defense counsel did not raise the entrapment defense. Furthermore, we find that, based upon our examination of the record in the instant case, Trial Term did not abuse its discretion in refusing to grant defense counsel leave to reopen the defense summation, since "[i]t is well established that the order of trial prescribed by statute should be followed unless there is a showing of a compelling reason for a variation" (*People v Theriault*, 75 AD2d 971).

■ Subsequent to the defense summation, Trial Term advised defense counsel that it would not charge the jury on the defense of entrapment. Defense counsel objected unsuccessfully. We find that Trial Term did not err in refusing to charge this defense since "the defendant failed to raise a factual question as to whether he was actively induced by government agents to commit the criminal act * * * for which he was convicted" (*People v Seale*, 47 NY2d 923, 924). Even though defense counsel stated that he was raising the defense of entrapment, the defense never went forward on that issue. Entrapment is an affirmative defense (Penal Law § 40.05), which the defense has the burden of proving (*People v Millard*, 90 AD2d 590, 591).

Within less than an hour of being instructed on the law, the jury found the defendant guilty.

Prior to the sentencing date, defendant moved to set aside the verdict, pursuant to CPL 330.30 (1) which reads, in pertinent part, as follows:

"At any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following [ground]:

"1. Any ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court."

In his moving papers in support of this motion, defendant, in substance, contended that Trial Term erred in refusing: (1) to charge the entrapment defense, and, (2) to allow the defense to reopen the summation. Both of these contentions lack merit for the reasons we mentioned *supra*.

However, Trial Term granted defendant's motion, upon the basis that: "I have reviewed the record; I have reviewed the minutes. I've reviewed the motion papers. I think I should have let him [defense counsel] reopen his summation * * * I think I made a mistake. I realize it. I'm ordering a new trial." We disagree.

■ In view of the fact that our examination of this record leads us to conclude that there was sufficient evidence to support the jury's verdict, and that as a matter of law the defendant's guilt was proven beyond a reasonable doubt, it was error for Trial Term to grant this motion. Recently a unanimous Court of Appeals stated in *People v Carter* (63 NY2d 530, 537) that Trial Term's power to set aside a verdict, pursuant to CPL 330.30 (1) *is limited* to instances where the defendant's conviction is "based upon insufficient evidence or evidence which *as a matter of law* was inadequate to prove guilt beyond a reasonable doubt" (emphasis added).

In the case before us, we find that it was the strategy of the defense not to raise the entrapment defense because that would have opened the door to the People being permitted to present evidence of the predisposition of the defendant to commit criminal acts (*People v Muzio*, 91 AD2d 1050). As evidence of the careful thinking that went into making this strategic decision, we note that defense counsel had, by his own admission to Trial Term, more than 20 years' experience.

In conclusion, we note that the proof of the defendant's guilt was overwhelming. In addition to the testimony of the under-

cover Detective DeCesare, there were tape recordings containing defendant's own words that spelled out a pattern of dealing in stolen goods. For example, as mentioned *supra,* defendant discussed with DeCesare the effect that hidden serial numbers had on setting the price for, and disposing of, stolen merchandise. Furthermore, the plan devised by defendant for delivery of the typewriters indicates a person skilled in participating in surreptitious transactions. We fully comprehend defense counsel's strategy, and based on the overwhelming evidence available to the People, of defendant's predisposition to purchase stolen property, we understand his desire to keep such evidence from being highlighted to the jury.

Accordingly, the order, New York County (Ernst Rosenberger, J.), entered September 12, 1983, which granted defendant's motion to set aside the jury's verdicts of guilty of the crimes of attempted criminal possession of stolen property in the first degree (Penal Law §§ 110.00, 165.50) and of official misconduct (Penal Law § 195.00 [2]), should be unanimously reversed, on the law, defendant's motion denied, the verdicts of the jury reinstated, and this matter remanded for further proceedings.

KUPFERMAN, J. P., CARRO and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on September 12, 1983, unanimously reversed, on the law, defendant's motion is denied, the verdicts of the jury are reinstated, and this matter is remanded for further proceedings.